## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

LATARSHA LORAIN
WILLIAMS,

       Plaintiff,

v.

FREEDOM MORTGAGE
CORPORATION,

       Defendant.

)
)
)
)
)
)
)
)
)
)
)

Civil Action File No.:


**COMPLAINT**
**WITH JURY TRIAL DEMAND**

## PRELIMINARY STATEMENT

1.     Under the Fair Credit Reporting Act, 15 U.S. Code § 1681, *et seq*. (the "FCRA"), furnishers of information have two primary duties: to report complete and accurate information regarding the consumers about whom the furnishers report; and, upon receiving notice of a consumer's dispute from a consumer reporting agency, to conduct an investigation of the disputed information, and then modify, delete, or permanently block the reporting of that information as appropriate.  *See*, 15 U.S. Code § 1681s-2.

2.     Defendant reports and maintains information concerning on Plaintiff's credit-worthiness, credit-standing, credit capacity, character, and general reputation. That information is then made available by third-parties in credit transactions

involving Plaintiff, for employment purposes, the underwriting of insurance for Plaintiff, and even in connection with a determination of Plaintiff's eligibility for a license or other governmental benefit.

3.    Accordingly, and pursuant to various provisions of the FCRA, Plaintiff has a legally protected interest in Defendant fulfilling its duties under the FCRA, so that the information reported and maintained by Defendant is done so in a manner which is fair and equitable to Plaintiff, with regards to the confidentiality, accuracy, and relevancy of that information.

4.    A furnisher's failure to comply with 15 U.S.C. § 1681s-2(b) of the FCRA gives rise to a private cause of action, and such action provides for remedies including actual damages, costs, statutory damages, and attorneys' fees. *See* 15 U.S.C. §§ 1681n and 1681o.

5.    The Real Estate Settlement Procedures Act of 1974 ("RESPA") (12 U.S.C. 2601 *et seq.*) is a remedial consumer protection statute, and as such, it should be construed liberally in order to best serve Congress' intent. *Meeks v. Ocwen Loan Servicing LLC*, No. 16-cv-81003-BLOOM/Valle, 2016 U.S. Dist. LEXIS 97505, at *14 (S.D. Fla. July 25, 2016).

6.     RESPA requires servicers to comply with the obligations specified in 12 U.S.C. § 2605, as well as any regulations issued to carry out the statute's purposes. *See* 12 U.S.C. § 2605(k)(1).

7.     12 C.F.R. § 1024—also known as Regulation X, or Reg X—was issued by the Bureau of Consumer Financial Protection to implement RESPA, and, among other things, addresses mortgage loan servicers' obligations to timely provide information requested by borrowers.

8.     A servicer's failure to comply with RESPA, or its implementing regulations, gives rise to a private cause of action, and such action provides for remedies including actual damages, costs, statutory damages, and attorneys' fees. *See Id*. § 2605(f).

9.     At all times relative hereto, Plaintiff's chief concern was to ensure that to the extent Defendant furnished information to consumer reporting agencies about Plaintiff's mortgage loan, that Defendant's reporting was accurately reflected in Plaintiff's credit file and on Plaintiff's consumer reports.

10.    This action for damages is based on Defendant's failure to conduct reasonable investigations of Plaintiff's disputes of inaccurate information on Plaintiff's consumer reports, in violation of 15 U.S.C. § 1681s-2(b).

11.   This action is also based on Defendant's failure to correct its failures to timely provide information in response to Plaintiff's valid written request for information and notice of error, in violation of 12 C.F.R. § 1024.35.

## PARTIES

12.   Plaintiff, Latarsha Lorain Williams, is a natural person who resides in Gwinnett County, Georgia.

13.   Defendant, Freedom Mortgage Corporation (hereinafter "Defendant" or "Freedom Mortgage"), is a corporation formed under the laws of the State of New Jersey and registered to do business in the State of Georgia. Freedom Mortgage may be served with process via its registered agent, C T Corporation System, at 289 S. Culver St, Lawrenceville, Georgia, 30046-4805.

14.   Freedom Mortgage regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about consumer transactions, such as Plaintiff's transactions at issue in this lawsuit and described herein, and is, therefore, a "furnisher" as that term is used in 15 U.S.C. § 1681s-2.

15.   At all times relative hereto, Freedom Mortgage was the "servicer" of Plaintiff's mortgage, as that term is used in 12 U.S.C. 2601 *et seq.*

## JURISDICTION

16.   This action is filed in part to enforce regulations promulgated by the Consumer Finance Protection Bureau (CFPB) that became effective on January 10, 2014, specifically, 12 C.F.R. § 1024, *et seq*., of Regulation X.

17.   Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the Dodd-Frank Wall Street Reform and Consumer Protection Act (DFA), and the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. §§ 2601, *et seq*.

18.   This Court has federal question jurisdiction over Plaintiff's Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq*., claims, pursuant to 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

19.   This Court has personal jurisdiction over Freedom Mortgage, pursuant to O.C.G.A. § 9-10-91(1), because, *inter alia*, Freedom Mortgage frequently and routinely conducts business in the State of Georgia, including the conduct complained of herein.

20.   Pursuant to 28 U.S.C. § 1391, venue is proper in the Northern District of Georgia because a substantial part of the events or omissions giving rise to the claims occurred in this district.

21.    Pursuant to LR 3.1B(3), venue is proper in the Atlanta Division because Defendant maintains an agent for service of process within the Atlanta Division.

## Factual Allegations Regarding Plaintiff's Mortgage

22.    On or about May 23, 2014, Plaintiff obtained a residential home loan from Brand Mortgage Group, LLC ("Brand Mortgage") for the original principal amount of $181,649.00 (the "Mortgage").

23.    The Mortgage is collateralized by residential real property located at 928 Pine Lane, Lawrenceville, GA  30043 (the "Property"), as evidenced by the Security Deed recorded at Deed Book 52947, Page 00674 in the Superior Court of Gwinnett County.

24.    At all times relevant hereto, Plaintiff maintained the Property as Plaintiff's primary, principal residence.

25.    On or about April 21, 2015, the Mortgage was transferred from Brand Mortgage to Freedom Mortgage, as evidenced by the Assignment recorded at Deed Book 53524, Page 0916, in the Superior Court of Gwinnett County.

26.    Freedom Mortgage is the servicer of the Mortgage loan.

27.    In January 2013, the CFPB issued a number of final rules concerning mortgage markets in the United States, pursuant to the DFA, Public Law No. 111-203, 124 Stat. 1376 (2010).

28.   Specifically, on January 17, 2013, the CFPB issued RESPA (Regulation X) and TILA (Regulation Z) Mortgage Servicing Final Rules, 78 F.R. 10695 (Regulation X) (February 14, 2013), and 78 F.R. 10901 (Regulation Z) (February 14, 2013) and, which became effective on January 10, 2014.

29.   The Mortgage in this matter is a "federally related mortgage loan" as that term is defined by 12 U.S.C. § 2602(1) and 12 C.F.R. § 1024.2(b).

30.   Freedom Mortgage is subject to the aforesaid Regulations pursuant to 12 U.S.C. § 2605(k)(1)(E).

31.   Freedom Mortgage does not qualify for the exception for "small servicers," as that term is defined in 12 C.F.R. §1026.41(e)(4).

32.   Freedom Mortgage does not qualify for the exemption for a "qualified lender", as that term is defined in 12 C.F.R. § 617.700.

### Factual Allegations Regarding Plaintiff's Bankruptcy Case

33.   On January 11, 2017, Plaintiff filed a Chapter 13 Voluntary Bankruptcy Petition in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division, Case Number 17-50567 (the "Bankruptcy Case").

34.   In Schedule D of her Bankruptcy Petition, Plaintiff scheduled Freedom Mortgage as a secured creditor for the Mortgage, with a claim in the amount $176,206.00.

35.   On January 11, 2017, Plaintiff filed her Chapter 13 Plan in accordance with 11 U.S.C. § 1322(b)(5), providing for the cure of any then-deficiency and the direct payment of all future Mortgage payments by Plaintiff to Freedom Mortgage.

36.   On May 25, 2017, Plaintiff's Chapter 13 Plan was confirmed (the "Confirmed Plan") and became *res judicata* as to Plaintiff and Defendant.

37.   Freedom Mortgage was served with a copy of the Confirmation Order on May 27, 2017 by the Bankruptcy Noticing Center.

38.    On November 19, 2018, Defendant filed a Proof of Claim in Plaintiff's Bankruptcy Case, Claim #18, representing it was owed $ 1,031.00, inclusive of $1,031.00 in arrearages.

39.   Plaintiff's Confirmed Plan does not call for the surrender of the Property securing the Mortgage, and Plaintiff has not surrendered the Property securing the Mortgage.

40.   Accordingly, Plaintiff is not seeking a discharge of her Mortgage debt. Indeed, the Mortgage debt is not subject to discharge pursuant to 11 U.S.C. §§ 1322(b)(2) and 1328(a)(1). See, *Dukes v. Suncoast Credit Union* (*In re Dukes*), 909 F.3d 1306 (11th Cir. 2018).

41.   The Bankruptcy Case is currently pending, and Plaintiff continues to substantially perform under the terms of her Confirmed Plan and the underlying Mortgage note.

42.   Accordingly, Plaintiff has continued to make her post-filing Mortgage payments to Freedom Mortgage, and Freedom Mortgage has continued to service Plaintiff's Mortgage and accept Plaintiff's post-filing Mortgage payments.

43.   The balance of the Plaintiff's Mortgage is not $0.

44.   Plaintiff's Mortgage is not closed.

### Effect of Consumer Reports Which Contain Inaccurate or Misleading Information

45.   Under the FCRA, the term "consumer report" generally refers to:

> any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for:
>
> > i.    credit or insurance to be used primarily for personal, family, or household purposes;
> >
> > ii.   employment purposes; or
> >
> > iii.  any other purpose authorized under section 1681b of this title.

15 U.S.C. § 1681a(d)(1).

46.     The information contained in a consumer report bears on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, and personal characteristics.

47.     The information contained in a consumer report can have a tremendous effect on the consumer; to name only a few, the report can impact the consumer's:

a.     Eligibility for and terms for credit;

b.     Potential for refinancing of existing credit;

c.     Eligibility for leasing prospects;

d.     Eligibility for utility services;

e.     Eligibility for and the terms of insurance;

f.     Employment or potential employment;

g.     Accounts which are under collection or review;

h.     Eligibility for a license or other benefit granted by a governmental instrumentality, particularly where the instrumentality is required by law to consider an applicant's financial responsibility or status;

i.     Standing with potential investors or servicers; and

j.     Eligibility for individually-billed travel charge cards used by executive departments and agencies.

48.    The terms "consumer report", "credit report", and "consumer credit report" are used synonymously herein.

49.    Approximately two million consumer reports are issued by credit bureaus each day. See, Robert B. Avery, Paul S. Calem, and Glenn B. Canner, Federal Reserve Board, Division of Research and Statistics, and Raphael W. Bostic, University of Southern California, *An Overview of Consumer Data and Credit Reporting* (February 2003), p. 48-49, available at https://www.federalreserve.gov/pubs/bulletin/2003/0203lead.pdf, *archived at* https://perma.cc/DCY4-ZS6C (last accessed on September 3, 2018).

50.    In 2012, the Federal Trade Commission conducted a study regarding consumer credit reporting errors and determined that anywhere from 10 to 21 percent of consumers have confirmed errors on their consumer reports. Federal Trade Commission, Report to Congress under Section 319 of the Fair and Accurate Credit Transactions Act of 2003 (December 2012), p. iv of Executive Summary, available at https://www.ftc.gov/sites/default/files/documents/reports/section-319-fair-and-accurate-credit-transactions-act-2003-fifth-interim-federal-trade-commission/130211factareport.pdf, archived at https://perma.cc/R3P4-FGV9 (last accessed on September 3, 2018).

51.    The FTC study found that not only do these errors adversely affect consumers' credit scores, but the estimated proportion of reports and consumers who experience a positive credit score change resulting from the *correction* of these errors is higher than previous estimates from the credit reporting industry. *Id*.

### *Credit Scoring*

52.    The Fair Isaac Corporation credit risk scoring system, commonly referred to as "FICO", is the leading credit scoring system and utilizes data reported by credit reporting agencies. See, https://www.myfico.com/credit-education/credit-scores/ (last accessed on September 3, 2018).

53.    The Fair Isaac Corporation uses the data in consumer reports to calculate consumers' credit scores (also known as credit risk scores). *Id*.

54.    The term "credit score" is a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default. Consumer Financial Protection Bureau, *Supervision and Examination Manual, Version 2* (October 2012), p. 53, available at http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf, *archived at* http://perma.cc/JF32-RFAA, (last accessed on September 3, 2018).

55.   FICO scores are calculated from five main categories of credit data in a consumer's credit report. Those categories, and their weighted values, are as follows: payment history accounts for 35% of a consumer's FICO score; debt/amounts owed accounts for 30% of a consumer's FICO score; age/length of credit history accounts for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10% of a consumer's FICO score; and mix of accounts/types of credit accounts for 10% of a consumer's FICO score. See, https://www.myfico.com/credit-education/whats-in-your-credit-score/, *archived at* https://perma.cc/E8Y3-F4AA (last accessed September 3, 2018).

56.   Payment history is the most important aspect of a consumer's credit score because it shows how the consumer has managed his finances, including any late payments. Credit history is also very important, as it demonstrates how long the consumer has been managing his accounts, when his last payments were made, and any recent charges. See, https://www.transunion.com/credit-score, *archived at* https://perma.cc/NRZ4-W83U (last accessed September 3, 2018).

57.   The cost of credit (e.g., interest rates, fees, etc.), the availability of credit, ratings for insurance products, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extended financing

periods and lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's credit score.

58.    Inaccurate or incorrect credit reporting very often results in a lower FICO and other credit scoring model scores, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers.

59.    Incorrectly reporting the tradeline of Plaintiff's Mortgage—which is open, active, and has a balance that Plaintiff is making payments on—as closed, and with incorrect, outdated payment information, adversely affects Plaintiff's FICO score, as it excludes any recent positive payment history associated with the Mortgage, it alters the age/length of credit history, and it alters the mix of accounts/types.

60.    There is no established rule or threshold for classifying the significance of a credit score change as minor or major because the impact of a change in score is dependent on the current score. That is, a twenty-five-point change in a credit score that keeps the consumer in a particular credit risk category may not have a large impact on the person's likelihood of receiving credit. However, a one-point change in credit score that moves the consumer from one risk tier to the next may have a large impact on the consumer's access to credit or the products and rates the consumer is able to secure.

61.    Consistent with FTC study, the Fair Isaac Corporation states that inaccurate or incorrect information on a consumer's credit report can hurt their score. See, https://www.myfico.com/credit-education/questions/fix-errors-on-credit-report*/, archived at* https://perma.cc/9TQN-S5WP (last accessed September 3, 2018).

*Insurance Scoring*

62.    Other entities that regularly review consumer reports, and use the data contained therein, are insurance companies.

63.    Insurance companies use a scoring mechanism which is similar to, but distinct from, the "credit score" used by creditors.

64.    Credit-based insurance scores, like credit scores themselves, are numerical summaries of consumers' credit histories; credit-based insurance scores are typically calculated using a multitude of information, including, but not limited to, the length and age of credit history and the use of certain types of credit. Federal Trade Commission, *Credit-Based Insurance Scores: Impacts on Consumers of Automobile Insurance* (July 2007), p. 11, available at https://www.ftc.gov/sites/default/files/documents/reports/credit-based-insurance-scores-impacts-consumers-automobile-insurance-report-congress-federal-trade/p044804facta_report_credit-based_insurance_scores.pdf*, archived at*

https://perma.cc/B2VQ-452N (last accessed September 3, 2018). As cited in *Ins. Inst. V. Commissioner*, 486 Mich. 370, 785 N.W.2d 67 (2010).

65.     Credit-based insurance scores evolved from traditional credit scores, and all major automobile insurance companies use credit-based insurance scores in some capacity; insurers use these scores to assign consumers to risk pools and to determine the premiums that they pay. *Id*. at 22.

66.     A Wallethub study determined that a change in credit scores caused a consumer's automobile insurance rates to rise by an average of 67% nationwide, and an average of 84% in Georgia. *2018's States Where Credit Scores Affect Car Insurance the Most – Credit Score & Car Insurance Report*, available at https://wallethub.com/edu/car-insurance-by-credit-score-report/4343/, *archived at* https://perma.cc/CSL8-D47Y (last accessed September 3, 2018).

67.     Homeowner's insurance companies also use credit scores to decide whether to issue policies, and on what terms. A higher credit score is taken to mean that a consumer is less of a risk, which, in turn, means the consumer is more likely to be able to obtain insurance, and pay less for it.

See     https://www.consumer.ftc.gov/articles/0152-credit-scores, *archived at* https://perma.cc/EB3D-54UP (last accessed September 3, 2018).

68.     The National Association of Insurance Commissioners ("NAIC") is the U.S. standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia, and five U.S. territories. See, http://www.naic.org/index_about.htm (last accessed September 3, 2018).

69.     The NAIC advises consumers who find errors on their credit reports to contact the credit reporting company to have the errors corrected, as the errors can affect the consumer's credit-based insurance score. National Association of Insurance Commissioners, *Credit-Based Insurance Scores: How an Insurance Company Can Use Your Credit to Determine Your Premium*, available at http://www.naic.org/documents/consumer_alert_credit_based_insurance_scores.htm, *archived at* https://perma.cc/S4F2-9VTL (last accessed September 3, 2018).

70.     There are several different companies that create credit-based insurance score reports for insurers to use, including the Fair Isaac Corporation.  In calculating credit-based insurance scores, FICO looks at five general areas it believes will best determine how an individual manage risks. *Id*.

71.     The following is a breakdown of what FICO considers in calculating credit-based insurance scores, and how much the information generally weighs in that calculation: payment history accounts for 40% of a consumer's of a consumer's

FICO credit-based insurance score; debt/amounts owed accounts for 30% of a consumer's of a consumer's FICO credit-based insurance score; age/length of credit history accounts for 15% of a consumer's FICO credit-based insurance score; new credit/recent inquiries accounts for 10% of a consumer's of a consumer's FICO credit-based insurance score; and, mix of accounts/types of credit accounts for 5% of a consumer's of a consumer's FICO credit-based insurance score. *Id.*

72.    Incorrectly reporting the tradeline of Plaintiff's Mortgage—which is open, active, and has a balance that Plaintiff is making payments on—as having a zero balance adversely affects Plaintiff's FICO credit-based insurance score, as it excludes any recent positive payment history associated with the Mortgage, it alters the age/length of credit history, and it alters the mix of accounts/types.

### *The Consumer Credit Reporting Industry, Reporting Standards, and Disputed Information*

73.    The Consumer Data Industry Association ("CDIA") is an international trade association, representing over 140 members involved in credit reporting, mortgage reporting, check verification, tenant and employment screening, collection services, and fraud verification services, and the CDIA is active in both federal and state legislative affairs, public relations, education, and the promulgation of industry standards.

74.   Because consumer credit reporting information is such sensitive data that has far reaching implications for most, if not all, consumers, the CDIA works together with the consumer reporting agencies ("CRAs") Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), TransUnion LLC ("TransUnion"), and CBCInnovis, Inc. ("Innovis") to develop, maintain and enhance industry-standard reporting formats and guidelines.

75.   In cooperation with the CRAs, the CDIA publishes the Metro 2 ("Metro 2") reporting standards to assist data furnishers with their compliance requirements under the Fair Credit Reporting Act (the "FCRA") (15 U.S.C. § 1681 *et seq*.).   The CDIA's reporting products are used in more than nine billion transactions each year. See, *http://www.cdiaonline.org/about/index.cfm?unItemNumber=515*.

76.   The uniform adoption and implementation of the Metro 2 standards is the primary vehicle by which CRAs and data furnishers ensure that they are in compliance with their duties to ensure that they maintain complete and accurate information under the FCRA.

77.   The Metro 2 format is the industry standard for reporting consumer information, and the Metro 2 standards provide uniformity in the reporting and interpretation of credit data, including credit risk scoring

78.   Each and all of the CRAs require data furnishers, such as Freedom Mortgage, to report that data electronically, and in compliance with Metro 2.

79.   Using Metro 2-compliant systems, furnishers submit credit reporting data to CRAs using a standard, documented, plain-text, human readable format. Metro 2-formatted records can be easily exported to a platform-independent text file to be provided to consumers.

80.   As data furnishers report to CRAs electronically, and in compliance with Metro 2, data furnishers have easy access to what information was actually reported, and thus the ability to provide that information to their customers with minimal effort.

81.   15 U.S.C. § 1681i(a)(5)(D) of the FCRA requires CRAs to implement an automated reinvestigation system through which furnishers of information to a CRA may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file to other CRAs.

82.   To comply with the automated dispute reinvestigation requirements of the FCRA, the CRAs developed and implemented a browser-based software system that allows the CRAs to electronically notify furnishers easily and quickly of disputed credit reporting information, and for furnishers to easily and quickly respond to such disputes following investigation. The system is commonly referred

to as e-OSCAR (Online Solution for Complete and Accurate Reporting) and was designed to be Metro 2 compliant.

See, *http://www.e-oscar.org/*.

83.   The e-OSCAR system supports Automated Credit Dispute Verification ("ACDV") and Automated Universal Dataform ("AUD") processing, as well as other various related data reporting processes.

84.   ACDVs are notifications initiated by a CRA, and transmitted to a furnisher, in response to a consumer dispute, and are the primary method the CRAs use to fulfill their statutory obligation to notify furnishers of disputed information of consumers' disputes.

85.   AUDs are initiated by the data furnisher and are used to process out-of-cycle credit history updates.

86.   Both ACDVs and AUDs are readily accessible via e-Oscar and can easily be exported for printing using e-Oscar's "Export CSV command link."

**Factual Allegations Regarding Plaintiff's TransUnion LLC Consumer Report**

87.    On or about October 4, 2017, Plaintiff obtained a copy of her consumer report as published by TransUnion.

88.    That report contained false, inaccurate, and misleading information that was detrimental to Plaintiff's credit score/credit rating.

89.    Specifically, the report showed the Freedom Mortgage tradeline incorrectly reporting the Mortgage with a $0 balance.

90.    The relevant portion of the Freedom Mortgage tradeline appeared in the October 4, 2017 TransUnion report as follows:

**FREEDOM MORTGAGE  #9035****
907 PLEASANT VALLESTE 3
MOUNT LAUREL, NJ 08054
(866) 369-2012

| Date Opened: | 04/21/2015 | Balance: | $0 | Pay Status: | >Account Included in |
| Responsibility: | Individual Account | Date Updated: | 08/31/2017 | | Bankruptcy< |
| Account Type: | Mortgage Account | Last Payment Made: | 08/24/2017 | Terms: | $21 per month, paid |
| Loan Type: | FHA REAL ESTATE | High Balance: | $180,977 | | Monthly for 348 months |
| | MORTGAGE | | | | |

Remarks: >CHAPTER 13 BANKRUPTCY<
Estimated month and year that this item will be removed: 12/2023

| | 07/2017 | 06/2017 | 05/2017 | 04/2017 | 03/2017 | 02/2017 | 01/2017 | 12/2016 | 11/2016 | 10/2016 |
|---|---|---|---|---|---|---|---|---|---|---|
| Rating | X | X | X | X | X | X | X | OK | OK | OK |

| | 09/2016 | 08/2016 | 07/2016 | 06/2016 | 05/2016 | 04/2016 | 03/2016 | 02/2016 | 01/2016 | 12/2015 |
|---|---|---|---|---|---|---|---|---|---|---|
| Rating | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| | 11/2015 | 10/2015 | 09/2015 | 08/2015 | 07/2015 | 06/2015 | 05/2015 | 04/2015 |
|---|---|---|---|---|---|---|---|---|
| Rating | OK | OK | OK | OK | OK | OK | OK | OK |

(Remaining portion of tradeline omitted.)

91.    The information described above was both false and misleading for a number of reasons, including but not limited to the following:

   a.  The balance of the Mortgage is not $0;

   b.  The Mortgage was not discharge in bankruptcy;

92.    Further, the specific reporting described above was in derogation of accepted industry standards for reporting the account as set forth by the CDIA and

Metro 2 and as adopted by Freedom Mortgage. See e.g., 2015 CDIA Credit Reporting Resource Guide ("2019 Metro 2").

93.    In a letter dated December 14, 2017, Plaintiff disputed the inaccurate and misleading information directly to TransUnion and advised TransUnion that Freedom Mortgage is reporting incorrectly as to the current status, payment history and balance of the Mortgage. The relevant portion of Plaintiff's dispute is reproduced below:

> Freedom Mortgage, 907 Pleasant Valley, Suite 3, Mount Laurel, New Jersey 08054, account number 9035XXXX, is reporting incorrectly as to the current status, payment history and balance. It is included in my bankruptcy case (case number 17-50567, filed on January 11, 2017). The balance is not $0 and I am making payments as scheduled. I am including a copy of the creditor's proof of claim that reflects the balance. Please contact the mortgage company to confirm my payments and its claim and update this tradeline. Please forward the enclosed documents to assist the furnisher with its review.

94.    In support of Plaintiff's dispute, and to assist TransUnion with its investigation, Plaintiff included with her dispute a copy of the Proof of Claim filed by Freedom Mortgage.

95.    Pursuant to 15 U.S.C. § 1681i, TransUnion had a duty to notify Freedom Mortgage of Plaintiff's dispute within five business days of receiving the dispute, to forward the attached documents for Freedom Mortgage's review.

96.    Upon information and belief, TransUnion timely notified Freedom Mortgage of Plaintiff's dispute, as required by 15 U.S.C. § 1681i.

97.     Pursuant to 15 U.S.C. § 1681s-2(b), Freedom Mortgage had a duty to conduct an investigation with respect to the disputed information and to correct, modify or delete that information appropriately.

98.     In a document dated December 21, 2017, TransUnion advised Plaintiff that it had researched the dispute, and provided a "revised report" that reflected its findings. TransUnion provided a copy of the tradeline as reported "post-investigation," which reproduced the errors identified by Plaintiff in her original dispute letter, and additionally erroneously declared the Mortgage closed.

99.     The relevant portion of the Freedom Mortgage tradeline appeared in the December 21, 2017 TransUnion reinvestigation report as follows:

| Adverse Accounts | | | |
|---|---|---|---|
| **FREEDOM MORTGAGE #9035****** ( 907 PLEASANT VALLE, STE 3, MOUNT LAUREL, NJ 08054, (866) 369-2012 ) | | | |
| Date Opened: | 04/21/2015 | Balance: | $0 | Pay Status: ⟩Account Included in Bankruptcy⟨ |
| Responsibility: | Individual Account | Date Updated: | 10/31/2017 | Date Closed: 10/31/2017 |
| Account Type: | Mortgage Account | Last Payment Made: | 10/19/2017 | |
| Loan Type: | FHA REAL ESTATE MORTGAGE | High Balance: | $180,977 | |
| Remarks: ⟩CHAPTER 13 BANKRUPTCY⟨ | | | |
| Estimated month and year that this item will be removed: 12/2023 | | | |

(Remaining portion of tradeline omitted.)

100.     Upon information and belief, the false, derogatory information regarding Plaintiff and the Mortgage has been, and continues to be, published to third parties.

101.     Freedom Mortgage's post-investigation reporting is factually false and misleading.

102.   Freedom Mortgage's post-investigation reporting is in derogation of the Metro 2 reporting standards, and that departure and failure to adhere to the adopted guidelines also renders the reporting false and materially misleading, as users of consumer reports assume Freedom Mortgage's compliance with Metro 2 standards in reporting consumer information.

103.   There is no indication in the tradeline of the "verified" report that Plaintiff has disputed the information reported by Freedom Mortgage.

104.   Defendant's failure to note Plaintiff's legitimate dispute of the Freedom Mortgage tradeline also renders the reporting materially misleading.

105.   The TransUnion reinvestigation report advised Plaintiff that if the reinvestigation had not resolved her original dispute, or if Plaintiff had additional questions regarding the reporting, or wanted written verification concerning the account, Plaintiff should contact Freedom Mortgage directly.

**Plaintiff's Request for Information from Freedom Mortgage**

106.   On or about February 26, 2018, Plaintiff sent correspondence to Freedom Mortgage captioned or otherwise titled "Request for Information Pursuant to Regulation X under RESPA" (the "First RFI") via certified mail, tracking number 7017 1000 0000 3736 2399.

107. The First RFI requested Freedom Mortgage to provide specific credit reporting information (the "Requested Credit Reporting Information" or "RCRI"), from January 11, 2017, up to and including the date Freedom Mortgage responded to the request (the "Subject Time Period").

108. The RCRI included the following: a summary of the data Freedom Mortgage furnished about the Mortgage to the CRAs; for each month during the Subject Time Period, the balance, the date and amount of each payment, the Consumer Information Indicator, and, the Account Status that Defendant reported or otherwise furnished about the Mortgage to the CRAs; and, copies of any and all ACDVs Defendant received from the CRAs, and Defendant's response(s) thereto.

109. Freedom Mortgage received Plaintiff's First RFI on or about March 7, 2018.

110. On April 3, 2018, Freedom Mortgage responded to Plaintiff's First RFI.

111. However, Freedom Mortgage's April 3, 2018 response was deficient in that Freedom Mortgage failed to provide: any of the RCRI.

112. Freedom Mortgage's proffered no excuse for failing to provide the RCRI, and instead wrote that Freedom Mortgage submitted accurate information to the credit bureaus.

113. As of the date of this Complaint, Freedom Mortgage has failed to provide a proper, complete, substantive response to the RCRI, or a proper objection to Defendant's obligation to provide the requested information and documents.

114. Accordingly, on or about October 17, 2019, as a direct result of Freedom Mortgage's failure to provide the RCRI, Plaintiff sent additional correspondence to Freedom Mortgage, captioned or otherwise titled "Notice of Error Pursuant to 12 CFR § 1024.35 of Regulation X" (the "First Notice of Error" or "First NOE") via certified mail, tracking number 9171 9690 0935 0234 5318 58.

115. The First NOE notified Freedom Mortgage of Freedom Mortgage's failure to provide all of the RCRI, and again requested Freedom Mortgage provide the RCRI.

116. Freedom Mortgage received the First NOE on or about October 23, 2019.

117. Freedom Mortgage never responded to Plaintiff's First NOE.

118. As of the date of this Complaint, Freedom Mortgage has failed to provide a proper, complete, substantive response, or a proper objection to the RCRI, as requested in and by the First RFI and the First NOE.

119. Freedom Mortgage reported credit data via a Metro 2 compliant system to the CRAs in the ordinary course of its business.

120.  Freedom Mortgage is in the best position to know with certainty what data it furnished to CRAs regarding the Mortgage.

121.  Therefore, Freedom Mortgage was, at all times herein, the most reliable source of data furnished to the CRAs.

122.  Pursuant to 12 C.F.R. §§ 1024.36 and 1024.35, Freedom Mortgage had a legal obligation to provide Plaintiff with a complete response to the RFI(s) and NOE(s) and to provide the RCRI.

123.  Freedom Mortgage retains and can easily and readily access the RCRI.

124.  Freedom Mortgage could have easily provided Plaintiff with the RCRI within the time limit specified by 12 C.F.R. §§ 1024.36(d)(2) and 1024.35(e)(3), had Freedom Mortgage chosen to do so.

125.  Upon information and belief, the CRAs utilize their own internal policies and procedures regarding data processing, which *may* result in data furnished by mortgage loan servicers, like Freedom Mortgage, to be "suppressed."

126.  However, "suppressed" data would not be visible to consumers, like Plaintiff, requesting a complete credit file pursuant to 15 U.S.C. §1681g(a) from the CRAs.

127.  Without knowing what data Freedom Mortgage has reported/is reporting to the CRAs, Plaintiff is unable to determine if the CRAs are suppressing data which Freedom Mortgage has reported/is reporting.

128.  Without knowing what data the CRAs may or may not have suppressed, Plaintiff is unable to request that the CRAs update or correct Plaintiff's credit files as appropriate.

129.  Freedom Mortgage's provision of the RCRI would extricate Plaintiff from the current informational disadvantage.

130.  Freedom Mortgage's provision of the RCRI would put Plaintiff in a position to conduct a complete review of Plaintiff's credit files maintained by the CRAs, to ensure Freedom Mortgage's credit data reporting is accurately reflected in Plaintiff's credit files, and thus giving Plaintiff the benefit of a "fresh start," a fundamental goal of the federal bankruptcy laws.

131.  However, without the RCRI, Plaintiff simply unable to determine whether her credit files are "accurate" and "complete" as those terms are used by 15 U.S.C. §1681i(a)(5)(A).

132.  Without the RCRI, Plaintiff is unable to determine whether the CRAs followed "reasonable procedures to assure maximum possible accuracy of the

information" regarding the information Defendant furnished to the CRAs concerning Plaintiff and the Mortgage, as required by 15 U.S.C. §1681e(b).

133.  Freedom Mortgage's provision of the RCRI would permit the Plaintiff to do a "side by side" comparison of 1) the Plaintiff's credit files and 2) the RCRI responsive data.

134.  This would allow Plaintiff to ensure that the data furnished about the Mortgage by Freedom Mortgage is being reported completely and accurately by the CRAs.

135.  Without a response to the RCRI, Plaintiff is not in a position to know whether Plaintiff's consumer files are reflective of all the positive data being furnished by the Defendant, or, if erroneous adverse credit information is being reported, to allow the Plaintiff to inform the CRAs of such errors.

## Freedom Mortgage's Obligation to Respond to Plaintiff's Request for Information

136.  RESPA is a consumer protection statute that imposes a duty on servicers of mortgage loans to acknowledge and respond to inquiries from borrowers.  *Bivens v. Bank of Am., N.A.*, 868 F.3d 915, 918, 2017 WL 3529113, *2 (11th Cir. 2017).

137.  RESPA requires servicers to comply with the obligations specified in 12 U.S.C. § 2605, as well as any regulations issued to carry out the statute's purposes. See, 12 U.S.C. § 2605(k)(1).

138. A servicer's failure to comply with RESPA or its implementing regulations gives rise to a private cause of action. See, *Id*. § 2605(f).

139. Regulation X, which implements RESPA, was promulgated by the Consumer Financial Protection Bureau ("CFPB") and went into effect on January 10, 2014.

140. Under 12 USC § 2605(e) of RESPA, the servicer of a federally related mortgage loan is obligated to respond to a borrower's qualified written request for information ("QWR") related to the servicing of the loan.

141. Pursuant to 12 U.S.C. § 2605(i)(3), the term "servicing" means receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts described in § 2609, and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan.

142. However, a servicer's obligations to respond to RFIs under 12 C.F.R. § 1024.36 are broader than its obligations under 12 U.S.C. § 2605 to respond to QWRs, in that the scope of an RFI under § 1024.36 is not limited to information that is related to the "servicing" of the loan. *Mortgage Servicing Rules*, 78 FR 10696 at

10761 ("the final rule [**64] . . . does not limit information requests to those related to servicing").

143.  Accordingly, an RFI under § 1024.36 is valid if it seeks *any* information, subject to the following exceptions:

  a.  The information requested is substantially the same as information previously requested by the borrower which the servicer has previously provided;

  b.  The information requested is confidential, proprietary or privileged; the information requested is irrelevant and not directly related to the borrower's mortgage loan account;

  c.  The information request is overbroad or unduly burdensome;

  d.  The servicer receives the information request more than one year after the servicing for the mortgage has been transferred to another servicer; and/or, the servicer receives the information request more than one year after the mortgage loan is discharged.

144. The Official Bureau Interpretations to Regulation X provide the following examples of confidential, proprietary, or privileged information: (1) information regarding management or profitability of a servicer; (2) compensation or personnel actions relating to servicer personnel, including the personnel

responsible for serving a borrower's mortgage loan; (3) records of examination reports, compliance audits, borrower complaints, and internal investigations or external investigations; or, (4) information protected by the attorney client privilege. *Mortgage Servicing Rules*, 78 FR 10696 at 10891.

145. Plaintiff's requests for the RCRI clearly have no basis in, or relationship with or to, any of the examples set forth above.

146. The Official Bureau Interpretations to Regulation X provide the following examples of an irrelevant request for information: (1) information that relates to the servicing of mortgage loans other than a borrower's mortgage loan; (2) the servicer's training program for servicing personnel; (3) the servicer's servicing program guide; or, (4) investor instructions or requirements for servicers regarding criteria for negotiating or approving any program with a borrower, including any loss mitigation option.

147. Plaintiff's requests for the RCRI clearly have no basis in, or relationship with or to, any of the examples set forth above.

148. The Official Bureau Interpretations to Regulation X provide the following examples of an overbroad or unduly burdensome request for information: (1) requests that seek documents regarding "substantially all aspects of mortgage services, ie. a request for all mortgage loan filed documents; (2) requests that are not

reasonably understandable; (3) requests that purport to require servicers to provide information in specific formats such as a spreadsheet, when such information is not ordinarily stored in such format; and, (4) requests that are not likely to assist a borrower with the account, including, for example, copies of the front and back of all physical payment instruments.

149.  Plaintiff's requests for the RCRI clearly have no basis in, or relationship with or to, any of the examples set forth above.

150.  Further, 12 C.F.R. §1024.36(a) provides, in relevant part, that a request for information may consist of "any written request for information from a borrower that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and states the information the borrower is requesting with respect to the borrower's mortgage loan."

151.  Comment 1 of the Official Interpretations of the CFPB to 12 C.F.R. § 1024.36(a) provides that "[a]n information request is submitted by a borrower if the information request is submitted by an agent of the borrower."

152.  12 C.F.R. § 1024.36(d)(1) provides, in relevant part, that:

> [A] servicer must respond to an information request by either:
>
> (i) Providing the borrower with the requested information and contact information, including a telephone number, for further assistance in writing; or

(ii) Conducting a reasonable search for the requested information and providing the borrower with a written notification that states that the servicer has determined that the requested information is not available to the servicer, provides the basis for the servicer's determination, and provides contact information, including a telephone number, for further assistance

153. Additionally, 12 C.F.R. § 1024.36(d)(2)(i) provides that:

A servicer must comply with the requirements of paragraph (d)(1) of this section:

(A)    Not later than 10 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives an information request for the identity of, and address or other relevant contact information for, the owner or assignee of a mortgage loan; and

(B)    For all other requests for information, not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the information request.

154. The RFI and NOE were sent to Freedom Mortgage pursuant to 12 C.F.R. §§ 1024.36 and 1024.35 respectively, and requested that Freedom Mortgage provide specific credit reporting information regarding the Mortgage and Plaintiff that Freedom Mortgage reported to the CRAs.

155. The RFIs were not duplicative, as they were not requesting information that Freedom Mortgage previously provided.

156.  The RFI and NOE did not request confidential, proprietary or privileged information.  Rather, the RFI and NOE requested information about Plaintiff and her Mortgage that Freedom Mortgage reported to third parties.

157.  The RFI and NOE did not request irrelevant information, as the information requested was directly related to the Plaintiff's Mortgage loan account.

158.  The RFI and NOE were not overbroad or unduly burdensome, as the requested information is stored electronically, and is easily accessible and printable by Freedom Mortgage. As such, Freedom Mortgage could respond to Plaintiff's information requests without exceeding thirty (30) business days, and without incurring costs or dedicating resources that would be unreasonable in light of the circumstances.

159.  The RFI and NOE were received by Freedom Mortgage while Freedom Mortgage was actively servicing the Mortgage.

160.  Because the RFI and NOE requested information directly related to Plaintiff's Mortgage loan account, and there were no other exceptions that relieved Freedom Mortgage of its duty to comply with the requirements of 12 C.F.R. §§ 1024.36 and 1024.35, Freedom Mortgage was legally obligated to provide Plaintiff with the RCRI.

161.  Despite the foregoing, Freedom Mortgage failed to provide the RCRI.

## Injuries-in-Fact

### *Diminution of Plaintiff's Credit Score*

162.   Freedom Mortgage's actions and omissions have resulted in the illegitimate suppression of Plaintiff's FICO credit score and other credit rating model scores.

163.   The adverse effect on Plaintiff's credit score places Plaintiff at the material risk of being denied credit or receiving less favorable credit terms than her otherwise would.

164.   Further, the Courts have regularly held that allegations of lower credit scores, taken as true, are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III. *Pedro v. Equifax, Inc*., 868 F.3d 1275 (11th Cir. 2017) ("[H]er credit score dropped 100 points as a result of the challenged conduct. Because Pedro alleged that she suffered an injury in fact, she has standing to pursue her complaint."); *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583 (7th Cir. 2016) (standing where Plaintiffs alleged that they "have suffered damage to their credit and been forced to pay Ocwen greater payments and a higher interest rate"); *Santangelo v. Comcast Corp*., 162 F. Supp. 3d 691 (N.D. Ill. 2016) ("a depleted credit score is sufficient to constitute an injury-in-fact for the purposes of establishing Article III standing"); *Binns v. Ocwen Loan Servicing, LLC*, No. 14-

01764, 2015 U.S. Dist. LEXIS 132743, 2015 WL 5785693, at *9 (S.D. Ind. Sept. 30, 2015) ("injuries to plaintiffs' credit scores and reputations were considered intangible harms"); *Rothman v. U.S. Bank Nat'l Ass'n,* No. 13-03381, 2014 U.S. Dist. LEXIS 141100, 2014 WL 4966907, at *5 (N.D. Cal. Oct. 3, 2014) ("Injury to a credit score is sufficient to constitute 'actual damages'"); *Green v. RentGrow, Inc.,* No. 2:16cv421, 2016 U.S. Dist. LEXIS 166229 ("A decrease in credit score may still establish an injury in fact sufficient to confer standing"); *Adams v. Fifth Third Bank*, No. 3:16-CV-00218-TBR, 2017 U.S. Dist. LEXIS 18932 (W.D. Ky. Feb. 9, 2017) ("Plaintiffs' allegations of lower credit scores … are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III."); and, *Coulbertson v. Experian Info. Sols., Inc.,* No. 16-cv-05672-RS, 2017 U.S. Dist. LEXIS 69484 (N.D. Cal. Mar. 24, 2017) ("At a minimum, Coulbertson has alleged a sufficient injury-in-fact through her claim that her credit score suffered as a result of the credit report she disputes").

165. Freedom Mortgage's actions and omissions have resulted in the illegitimate suppression of Plaintiff's credit-based FICO insurance score.

166. The adverse effect on Plaintiff's credit-based FICO insurance score places Plaintiff at the material risk of being denied insurance or receiving less favorable insurance rates and terms than she otherwise would.

167.   Freedom Mortgage's actions and omissions have also caused Plaintiff's TransUnion credit report to falsely indicate to any viewer of that report that Plaintiff does not have a Mortgage, that the Mortgage was discharged in bankruptcy, and/or that Plaintiff is not current on her Mortgage payments.

168.   This false impression creates a material risk that Plaintiff would be denied credit, receive less favorable credit treatment than she otherwise would, or receive other unfavorable treatment than she otherwise would, from any viewer of Plaintiff's credit report engaged in judgment-based lending.

169.   However, the existence of consumer reports which inaccurately report Plaintiff's Mortgage as closed, with a $0 balance, and incomplete and/or incorrect payment information make it inherently more difficult and more expensive for Plaintiff to refinance the Mortgage.

170.  For example, for Plaintiff to obtain an FHA loan, the FHA's general credit policy requires lenders to obtain Plaintiff's full credit report–not just the Plaintiff's credit score–and analyze the Plaintiff's credit history, liabilities, and debts to determine creditworthiness. U.S. Dep't of Hous. and Urban Dev., *Handbook 4000.1, FHA Single Family Housing Policy Handbook*, 250 (December 30, 2016), *https://www.hud.gov/sites/documents/40001HSGH.PDF*   (January   16,   2018) [https://perma.cc/UE3H-N3BS].

171.  To obtain an FHA refinance of the Mortgage, the lender must be able to verify Plaintiff's payments for the Mortgage for the preceding 12 months. *Id*. at 409.

172.  In the event this information cannot be obtained via the consumer's credit report, FHA guidelines mandate that the consumer meet this burden through other, more difficult and time-consuming means. *Id*. at 410.

173.  Plaintiff's correct payment history would be included in Plaintiff's TransUnion credit report if Freedom Mortgage had conducted appropriate investigations of Plaintiff's dispute.

174.  However, because the Mortgage is reported in Plaintiff's TransUnion credit report as closed and with a $0 balance, Plaintiff will be forced to pursue alternative, more time-consuming, and more expensive means of demonstrating her payment history to a potential lender.

175.  Because Freedom Mortgage failed to comply with its duties under the FCRA as detailed herein, Plaintiff will need to obtain and provide verification of the Mortgage, bank statements, and/or other documents to demonstrate her payment history for the previous 12 months.

176.  This requires Plaintiff to expend more time, effort, and money due to Freedom Mortgage's failure to abide by its obligations under the FCRA to accurately report Plaintiff's credit history.

*Informational Injury*

177.   Freedom Mortgage's failures to abide by its obligations under 12 U.S.C. § 2605(k)(1) and 12 C.F.R. §§ 1024.36 and 1024.35 have caused Plaintiff to suffer an informational injury.

178.   "An 'informational injury' is a type of intangible injury that can constitute an Article III injury in fact."   *Stacy v. Dollar Tree Stores, Inc.,* 274 F. Supp. 3d 1355, 1363 (S.D. Fla. 2017) (citing *Dreher v. Experian Information Solutions, Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (citing *Federal Election Comm'n v. Akins*, 524 U.S. 11, 24, 118 S. Ct. 1777, 141 L. Ed. 2d 10 (1998) and *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449, 109 S. Ct. 2558, 105 L. Ed. 2d 377 (1989)).

179.   A constitutionally cognizable informational injury requires that a person lack access to information to which he is legally entitled, and that the denial of that information creates a real harm with an adverse effect. *Id*.

180.   Further, an injury-in-fact sufficient to satisfy Article III standing requirements "may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Church v. Accretive Health, Inc*., 654 Fed. Appx. 990, 2016 U.S. App. LEXIS 12414, 2016 WL 3611543 (11th Cir. 2016).

181.  Pursuant to 12 C.F.R. § 1024.36 of Regulation X and 12 U.S.C. § 2605 of RESPA, borrowers with federally related mortgage loans have a legal right to request and receive information directly related to their mortgage loan account from the servicer of their mortgage loan account.

182.  The RCRI is information directly related to Plaintiff's federally related mortgage loan account.

183.  Plaintiff lacks access to the RCRI.

184.  Freedom Mortgage is the only source from which Plaintiff may obtain or otherwise access the RCRI.

185.  Plaintiff has made legitimate requests for the RCRI, and Freedom Mortgage has repeatedly failed to provide information responsive to Plaintiff's requests.

186.  Accordingly, through the violation of Plaintiff's statutorily-created rights under Regulation X and RESPA, Plaintiff has suffered an injury-in-fact sufficient to establish Article III standing.

187.  Freedom Mortgage's deficient responses to the RFIs have further injured Plaintiff by preventing Plaintiff from taking important action.  See, *Baez v. Specialized Loan Servicing, Ltd. Liab. Co.*, 709 F. App'x 979, 984 (11th Cir. 2017)

188. Specifically, Freedom Mortgage's deficient responses have prevented Plaintiff from being able to take action to correct false, derogatory information on Plaintiff's consumer reports and/or in Plaintiff's credit file(s), which is being reported to third parties.

189. As such, Freedom Mortgage's completely deficient responses have resulted in Plaintiff being injured by the *continued* illegitimate suppression of Plaintiff's FICO credit and Plaintiff's other credit rating model scores, and the *continued* illegitimate suppression of Plaintiff's credit-based FICO insurance score.

190. The continued illegitimate suppression of Plaintiff's credit scores places Plaintiff at the material risk of being denied credit or receiving less favorable credit terms than Plaintiff otherwise would.

191. The continued illegitimate suppression of Plaintiff credit-based insurance scores places Plaintiff at the material risk of being denied insurance or receiving less favorable insurance rates and terms than Plaintiff otherwise would.

## **Damages**

### *Damages Resulting from Defendant's Violation of the FCRA*

192. Freedom Mortgage breached its duties as described herein.

193. Freedom Mortgage had actual notice that the information it was reporting regarding Plaintiff and the Mortgage was false, deceptive, and misleading.

194.   Freedom Mortgage failed to correct its false, deceptive, and misleading reporting as described herein.

195.   Freedom Mortgage had all the information necessary to correct its false, deceptive, and misleading reporting.

196.   Freedom Mortgage had the ability to correct its false, deceptive, and misleading reporting.

197.   Despite that, Freedom Mortgage continued to report the false, deceptive, and misleading information regarding Plaintiff and the Mortgage.

198.   Accordingly, Freedom Mortgage's conduct was willful.

199.   As a result of Freedom Mortgage's willful actions and omissions, Plaintiff is eligible for statutory damages.

200.   Additionally, as a result of Freedom Mortgage's actions and omissions, Plaintiff has suffered actual damages, including time spent challenging Freedom Mortgage's wrongful representations regarding the Mortgage.

201.   As a result of Freedom Mortgage's actions and omissions, Plaintiff's actual damages also include the illegitimate suppression of her FICO credit score and other credit rating modeling scores.

202.   Freedom Mortgage's failures to correct and clear the inaccuracies in Plaintiff's TransUnion report creates a material risk of financial harm to Plaintiff stemming from the decreased perception of Plaintiff's creditworthiness.

203.   As a result of Freedom Mortgage's failures to comply with its duties under the FCRA, Freedom Mortgage is liable to Plaintiff for actual damages, statutory damages, costs, and attorneys' fees.

*Damages Resulting from Defendant's Violations of RESPA/Reg X*

204.   Freedom Mortgage's repeated failures to provide the RCRI have caused Plaintiff to incur a number of unwarranted costs and fees in an effort to obtain transparency about Freedom Mortgage's credit reporting on the Mortgage.

205.   At all times relevant hereto, Plaintiff has merely wanted to pay (and has paid) ongoing monthly mortgage payments in fulfillment of the Mortgage obligations, and to continue to rehabilitate Plaintiff's credit during Plaintiff's Bankruptcy Case, in order to obtain the "fresh start" to which Plaintiff is entitled following bankruptcy.

206.   All requests for and attempts to obtain the RCRI have fallen on deaf ears, and any response Freedom Mortgage has supplied has been dismissive, vague, incomplete, or otherwise unhelpful and non-responsive, in dereliction of Freedom Mortgage's statutory duties discussed *supra*.

207.  Freedom Mortgage's improper actions have caused Plaintiff continued costs and damages.  Specifically, Plaintiff remains unable to conduct a complete credit file review, and has had to expend time and effort in retaining counsel and disputing the false information as a result of Freedom Mortgage's failures to comply with its statutory duties.

208.  Upon information and belief, despite receiving requests for information that comply with 12 C.F.R. § 1024.36, and notices of error that comply with 12 C.F.R. § 1024.35, Freedom Mortgage regularly fails to provide Borrowers with the type of credit reporting information at issue in this case.

209.  Upon information and belief, Freedom Mortgage's regular practice is to respond to requests for credit reporting information with standardized, form-based response letters, like the ones used to respond to Plaintiff's requests, which contain boilerplate objections that are not tailored to the individual request.

210.  Upon information and belief, on at least five separate occasions, including Plaintiff's case, Freedom Mortgage has used the same or substantially similar generic form letters to respond to requests for credit reporting information.

211.  Upon information and belief, Freedom Mortgage's actions are believed to be a pattern and practice of behavior, in conscious disregard of Freedom Mortgage's legal duties and Plaintiff's rights.

212. As a result of Freedom Mortgage's repeated failures to provide the RCRI, Freedom Mortgage is liable to Plaintiff for actual damages, statutory damages, costs, and attorneys' fees.

## CAUSES OF ACTION

## COUNT I

## VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
## 15 U.S.C. § 1681s-2(b)

213. Plaintiff incorporates by reference all preceding paragraphs as though fully stated herein.

214. Pursuant to 15 U.S.C. § 1681s-2(a), Freedom Mortgage is responsible for providing accurate information whenever it furnishes information to any consumer reporting agencies.

215. Upon information and belief, TransUnion timely notified Freedom Mortgage of Plaintiff's dispute and provided Freedom Mortgage with all the relevant information that Plaintiff had submitted.

216. Pursuant to 15 U.S.C. § 1681s-2(b), Freedom Mortgage had a duty to investigate Plaintiff's dispute and accurately report its findings to TransUnion.

217. A furnisher's investigation must be a good faith effort to ascertain the truth; a reasonable investigation must answer the substance of the consumer's

dispute and may not merely be a *pro forma* record review that simply begs the question.

218.   In order to conduct a reasonable investigation, and pursuant to 15 U.S.C. § 1681s-2(b), Freedom Mortgage was required to review and consider all relevant information submitted by Plaintiff to TransUnion.

219.   Plaintiff's dispute was clear and unambiguous as to the inaccuracies of reporting the Mortgage as closed, with a $0 balance and incomplete and/or incorrect payment information.

220.   Freedom Mortgage breached its duties as described herein.

221.   If Freedom Mortgage had conducted a reasonable investigation of Plaintiff's dispute, Freedom Mortgage would have reviewed and considered all of the information Plaintiff submitted to TransUnion in her dispute and would have easily detected that what was being reported was factually incorrect, inaccurate, and misleading.

222.   If Freedom Mortgage had conducted a reasonable investigation of Plaintiff's dispute, the Mortgage tradeline on Plaintiff's TransUnion consumer reports would have been corrected accordingly.

223.   Due to Freedom Mortgage's failures to provide accurate information and failures to conduct reasonable investigations of Plaintiff's dispute, the false and

misleading information in Plaintiff's credit file and on Plaintiff's reports as described herein was not appropriately modified.

224.   Freedom Mortgage had all the information necessary to correct its reporting.

225.   Freedom Mortgage failed to suitably correct its reporting in the face of clear evidence that it was false and misleading. The failure indicates that Freedom Mortgage's review procedures were not reasonable.

226.   The fact that Freedom Mortgage had all the information necessary to correct its reporting, yet failed to appropriately do so, further indicates that Freedom Mortgage recklessly disregarded Plaintiff's dispute and the requirements of the FCRA, amounting to a willful violation of the statute.

227.   Freedom Mortgage willfully, or in the alternative negligently, violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation upon receiving notice of Plaintiff's dispute from TransUnion, by failing to appropriately report the results of its investigation, and by failing to appropriately modify the disputed information, in reckless disregard of the statutory requirements, Plaintiff's dispute, and the publicly recorded Bankruptcy Case filings.

228.   As a result of Freedom Mortgage's violations of 15 U.S.C. § 1681s-2(b), Plaintiff has suffered actual damages as stated herein. Plaintiff is, therefore,

entitled to recover actual damages from Freedom Mortgage under 15 U.S.C. §§ 1681n and/or 1681o.

229.  Freedom Mortgage's actions and omissions were willful, rendering Freedom Mortgage liable to Plaintiff for punitive damages and/or statutory damages, pursuant to 15 U.S.C. § 1681n.

230.  Plaintiff is entitled to recover costs and attorneys' fees from Freedom Mortgage, pursuant to 15 U.S.C. §§ 1681n and/or 1681o.

## COUNT II

### VIOLATIONS OF REGULATION X, 12 C.F.R. § 1024.35
**(Failure to respond in a timely manner to a notice of error issued pursuant to 12 C.F.R. § 1024.35)**

231.  Plaintiff incorporates by reference paragraphs 1 through 229 as though fully stated herein.

232.  Plaintiff sent the First RFI to Freedom Mortgage on or about February 26, 2018.

233.  Plaintiff sent the First RFI to Freedom Mortgage at Freedom Mortgage's self-designated address for the receipt of such correspondence pursuant to 12 C.F.R. § 1024.36(b).

234.  The First RFI constituted a request for information pursuant to 12 C.F.R. § 1024.36(a) as the First RFI requested information "with respect to the borrower's mortgage loan."

235.  Freedom Mortgage received the First RFI on or about March 7, 2018.

236.  Pursuant to 12 C.F.R. § 1024.36(d)(2)(i)(B), Freedom Mortgage was required to provide written correspondence to Plaintiff in response to Plaintiff's First RFI "not later than 30 days (excluding legal public holidays, Saturdays, and Sundays)" after receiving the First RFI (the "RFI Response Deadline").

237.  Plaintiff never received any written correspondence from Freedom Mortgage containing a proper, valid objection as to why Defendant was not required to respond to the First RFI and provide the RCRI by the RFI Response Deadline.

238.  Plaintiff never received any written correspondence from Freedom Mortgage containing a proper, substantive response to the First RFI by the RFI Response Deadline.

239.  Freedom Mortgage therefore failed to comply with the requirements of 12 C.F.R. §1024.36(d)(1) by the RFI Response Deadlines.

240.  Accordingly, and pursuant to 12 C.F.R. § 1024.35, Plaintiff sent Freedom Mortgage a Notice of Error (the First NOE") informing Freedom Mortgage of its failure, and reiterating Plaintiff's request for the RCRI.

241. Freedom Mortgage received the First NOE on or about October 23, 2019.

242. Pursuant to 12 C.F.R. § 1024.35(e)(3)(C), Freedom Mortgage was required to provide written correspondence to Plaintiff in response to Plaintiff's First NOE "within 30 days (excluding legal public holidays, Saturdays, and Sundays)" after receiving the First NOE (the "NOE Response Deadline").

243. Plaintiff never received any written correspondence from Freedom Mortgage containing a proper, valid objection as to why Defendant was not required to respond to the First NOE and provide the RCRI by the NOE Response Deadline.

244. Plaintiff never received any written correspondence from Freedom Mortgage containing a proper, substantive response to the First NOE by the NOE Response Deadline.

245. Defendant's failure to provide proper written correspondence to Plaintiff, in response to the First NOE and reiteration of Plaintiff's request for the RCRI before the NOE Response Deadline, constituted a willful violation of 12 C.F.R. §1024.35(e).

246. As a result of Defendant's actions and omissions, Plaintiff has been damaged as described *supra*.

247.  Accordingly, Plaintiff is entitled to recover Plaintiff's actual damages, statutory damages, costs, and attorneys' fees from Defendant.

## TRIAL BY JURY

248.  Plaintiff is entitled and hereby requests a trial by jury.

**WHEREFORE**, Plaintiff prays/Plaintiffs pray that judgment be entered in Plaintiff's favor and against Defendant for:

a.) Plaintiff's actual damages;

b.) Statutory damages of $1,000 per violation of the FCRA pursuant to 15 U.S.C. § 1681n;

c.) Punitive damages pursuant to 15 U.S.C. § 1681n;

d.) Reasonable attorney's fees and costs pursuant to 15 U.S.C. §§ 1681n and/or 1681o; and

e.) Statutory damages pursuant to 12 U.S.C. § 2605(f)(2) for each violation of 12 C.F.R. § 1024.35 detailed herein;

f.) Costs of litigation and reasonable attorney's fees pursuant to 12 U.S.C. § 2605(f)(3); and,

g.) Such other and further relief as may be just and proper.

Respectfully submitted this 26th day of November, 2019.

**BERRY & ASSOCIATES**

*/s/ Joseph L. Erkenbrack*
Matthew T. Berry
Georgia Bar No.: 055663
*matt@mattberry.com*
Joseph L. Erkenbrack
Georgia Bar No.: 801728
*jerkenbrack@mattberry.com*
Adam J. Klein
Georgia Bar No.: 425032
*aklein@mattberry.com*
2751 Buford Highway, Suite 600
Atlanta, GA 30324
Ph. (404) 235-3334
Fax (404) 235-3333

***Counsel for Plaintiff***